## Case No. 2,724.

### The CIRCASSIAN.

[3 Ben. 398; 3 Am. Law T. Rep. U. S. Cts. 4.] [1]

District Court, E. D. New York. Sept., 1869.

#### BOTTOMRY—ARREST OF SHIP—TELEGRAPH.

1. Where a steamship, arriving in Antwerp from New York, was consigned to S., who took the agency of the vessel, put her up for passengers and freight, and paid bills for her, and the vessel was attached for a private debt due from her owner, and it became necessary to relieve the vessel from that attachment, in order that she might sail as advertised, and thereupon the master of the steamer executed a bottomry bond to S. for the amount of the claim of the attaching creditor, and also of the advances made by S. for the steamer: *Held*, that inasmuch as the advances had been made without any agreement, or any reasonable expectation, that they were to be secured by bottomry, the bond was invalid as to that item.

[Cited in The Roslyn, Case No. 12,067; The Edward Albro, Id. 4,290.]

2. Although the design of the bond to release the ship from arrest, might be a ground sufficient to sustain the bond, yet, as it appeared that the master took no means whatever of communicating with the owner, although he could have done so by telegraph, (the arrival of the ship at Antwerp having been so announced to the owner,) he had no authority to bottomry the ship, and that S. was chargeable with notice of his want of authority, and the bond was invalid.

[Cited in The Eureka, Case No. 4,547.]

In admiralty. This was a libel by Daniel Steineman and Hermann Ludwig, composing the firm of Daniel Steineman & Co., of Antwerp, against the steamship Circassian, to enforce payment of a bottomry bond for the sum of 61,133 francs, given by the master to the libellants in the port of Antwerp.

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 3 Am. Law T. Rep. U. S. Cts. 4, contains only a partial report.]

The material facts were as follows: The Circassian was an ocean steamer, owned by one William Salem, a resident of New York, and was by him dispatched to Antwerp, as the first vessel of a line of steamers which it was proposed to establish between the ports of Antwerp and New York. The intention was to have such line conducted by a corporation, and such a corporation, called the Continental Mail Steamship Company, had been organized, and its officers designated; but its capital was not yet paid in, and it had neither the title nor the possession of the Circassian, or any other steamer. The Circassian, accordingly, went out under the command of a master appointed by Salem, her owner. Herman Troost was on board, in the capacity of secretary of the Continental Mail Steamship Company, and was also authorized by the owner to make the necessary arrangements, on the part of the ship, for the opening of the line in Antwerp. Upon the arrival of the steamer in Antwerp, the libellants were duly appointed agents of the proposed line, and the vessel was placed in their hands, as agents and consignees. They collected the inward freight, made arrangements with the government for the carriage of the mails, advertised the vessel to sail with the mails and passengers on a day certain, and procured for the vessel, furniture, bedding, provisions, &c., necessary and proper for a passenger steamer on the intended route. Passengers were also engaged, who paid their passage-money in advance. Freight also was shipped, on part of which the freight was paid in advance. After the vessel had fairly entered upon the adventure, and passengers had been engaged, the vessel was seized under an attachment issued to collect a personal debt of Salem, the owner; he being then insolvent, and his paper under protest in Antwerp. Efforts were at once made in court to procure the discharge of the attachment, but without success. Efforts to procure money sufficient to discharge the debt, for which the attachment was issued, were also made, and the master and Troost went to London for that purpose, but failed. An additional embarrassment arose out of the fact that the breaking out of the cholera had interfered with the engaging of passengers, so that, as the day of sailing approached, it appeared that the total amount of freight and passage-money collected was insufficient to pay the advances actually made by the agents towards fitting out the vessel for the voyage. When the sailing day arrived, the alternative was thus presented to the master of procuring, at once, the amount of the attaching creditor's claim, or of announcing that the departure of the steamer must be postponed until the termination of the legal proceedings by a judicial sale of the owner's interest in the vessel, which, with a vessel situated like this, was equivalent to a breaking up of the voyage,

an abandonment of the line, and a termination of the prospect of a regular employment for the steamer on the proposed route. The result of such a breaking up of the voyage, or even of any extended delay in the departure of the steamer, would have been to encumber the vessel with maritime liens to the passengers and freighters, for damages and freight pre-paid, which would, in all probability, have far exceeded in amount the debt for which the vessel was attached. In this emergency it was agreed between the master and Steineman & Co., the libellants, that they should procure the release of the vessel from the attachment, by guaranteeing the payment of the demand, and should be secured therefor, and also for the amount of their previous advances, by a bottomry bond upon the vessel. The release of the vessel was accordingly effected as thus proposed; the master executed to Steineman & Co. the bottomry bond in suit, and the steamer sailed on her appointed day, with the cargo and passengers which had been engaged. The voyage was performed in safety. Upon the arrival of the vessel in New York, she was taken possession of by Ernest Fiedler, who held a large mortgage upon her, which he proceeded to foreclose, and who, when she was proceeded against in this action, appeared as claimant, and disputed the validity of the bond.

Bowdoin, Larocque & Barlow, and W. W. MacFarland, as counsel for the libellants, presented the following points:

1. The bond was absolutely necessary to protect the interest of the respondent, who was a mortgagee, inasmuch as the ship was liable for the engagements for freight and passage entered into by the captain, in the regular course of business, and within the scope of his authority as master. As to this liability the following authorities are quite conclusive: The Phebe [Case No. 11,064]; The William & Emmeline [Id. 17,687]; The Freeman v. Buckingham, 18 How. [59 U. S.] 182; Thomas v. Osborn, 19 How. [60 U. S.] 22; Jackson v. The Julia Smith [Case No. 7,136].

2. The general principle that the master cannot give a valid bottomry bond to a creditor, to secure an antecedent debt, where that is the primary object of the bond, and without the existence of other circumstances making it necessary, is not denied, but fully conceded. The principle is sustained by numerous authorities. Greeley v. Smith [Case No. 5,750]. The same general rule was laid down in Hurry v. The John & Alice [Id. 6,923], where it is accurately said, that the money must be advanced "for a purpose necessary to enable the master to complete the voyage he was about to perform at the time the necessity existed for making the contract."

3. It is obvious that this rule can have no application to a case where the primary object is not to secure an antecedent debt, and

where the contract is not with the creditor, but where, on the contrary, the advance is absolutely essential to enable the master to "complete the voyage he was about to perform when the necessity arose," and likewise essential to enable the ship to fulfil her engagements, and escape condemnation for a failure to do so; and where the advantage to the creditor is incidental, but unavoidable. While necessity may be said to be the mother of bottomry bonds, yet the necessity itself may spring from innumerable causes. The law only requires that its existence should be shown, in order to pronounce the bond valid. The origin of that necessity is a comparatively unimportant consideration. "The advantage of allowing the master to take up money on bottomry consists in its enabling him to procure assistance when no other resource is at hand, and the adventure would be frustrated if no other resource was afforded." Smith Merc. Law, p. 418. "Necessity, to use the expression of Lord Stowell, is the vital principle of hypothecation, and the court of admiralty will consider every circumstance; will go into the whole history of the voyage, in order to determine whether there be that necessity without which an instrument of hypothecation is void." Id. p. 419. "Necessity creates the law, it supersedes rules, and whatever is reasonable and just in such cases is likewise legal." Sir Wm. Scott in the case of The Gratitudine, 3 C. Rob. Adm. 240, 266. See, also, The Nelson, 1 Hagg. Adm. 169; The Radamanthe, 1 Dod. 201; The Gauntlet, 3 W. Rob. Adm. 82. "That is a sufficient necessity which would induce an owner to do it on the spot." The Fortitude [Case No. 4,-953]. "The master may hypothecate the vessel in a foreign country, to enable him to return home, though the original voyage was broken up by capture, and the compulsory sale of the cargo." Crawford v. The William Penn [Id. 3,373]. "In all these cases much must be left to the master's discretion, and he must exercise it conscientiously, for the general interest. If he acts bona fide, and with reasonable care, the rights of the parties are bound up by his acts, although it should afterwards be found that he had committed an error of judgment, and might have acted more beneficially in another manner." Judge Story in The Packet [Id. 10,654]. Bottomry bonds are the creatures of necessity and distress, and may be expected, therefore, to assume different shapes, which cannot be limited except by the condition of a faithful and beneficial discharge of the authority exercised in granting them, as being necessary for the preservation of the property. The Vibilia, 1 W. Rob. Adm. 7.

4. We come now to consider, in the light of the foregoing authorities, the precise question, whether, in any case, a bottomry bond may be given to obtain the money necessary to liberate a ship from arrest, where the cause of arrest is a claim constituting per se no lien on the ship, and to secure which a valid bottomry bond could not be voluntarily given. In examining this question, it will appear: 1. That in no case, English or American, is it decided that a valid bottomry bond cannot be given to relieve a ship from such arrest. 2. That in all the American cases, in which the question has arisen, it has been held that a valid bottomry bond may be given, if necessary to relieve the ship from such arrest. 3. That a stronger case of necessity would not be likely ever to arise than the one which gave birth to this bond.

The attention of the court is invited first to the American doctrine on this subject. Mr. Parsons says: "Nor can a master make this bond merely to secure former debts of the owner, but might, perhaps, if it were the only way to liberate the ship from arrest and sale for those debts." 1 Pars. Mar. Law, 417. And again, at page 423: "So we hold, generally, that if the liberation of the ship from arrest for debt is a good cause for bottomry, yet, if the attaching creditor is himself the obligee, the bond is invalid." Judge Story was clearly of the opinion that the master might raise money on bottomry to redeem a ship from actual arrest, while "a mere threat to arrest the ship for pre-existing debt would not be sufficient, nor could a valid bond be executed to the creditor himself." This opinion must be taken as the opinion of the whole court, inasmuch as there was no dissent from the judgment, or the reasoning on which it was founded. The Aurora, 1 Wheat. [14 U. S.] 105. A bottomry bond is good if bona fide made in a foreign port to relieve a ship under arrest at the suit of a foreign creditor, but it is doubtful if the creditor himself could acquire a valid title thereby. Abb. Shipp. p. 157, note. In the case of The Boston [Case No. 1,669], decided by Judge Betts in 1832, the precise question was involved, and was decided. Certain creditors of the ship for debts incurred on a previous voyage threatened to arrest her, whereupon another person bought the debts, and to secure them, took a bottomry bond. In the course of a very elaborate opinion, the judge says: "The pre-eminent security of bottomry, with its high privileges, is sanctioned only when a ship is under positive arrest, and cannot take effect when the money is advanced only to avert a menaced arrest." It is plain, therefore, that according to the received American doctrine, this bottomry bond was authorized by the necessities of the ship, and is valid.

The English rule is thus stated in Maclachlan on Shipping: "The want which exacts the loan must be such as, if not supplied, would prevent the prosperous completion of the voyage, not extending to the master's own debts, or the discharge of his person from prison, or even the liberation of the ship herself from arrest without other circumstances combined." In Smith v. Gould, 4 Moore, P. C. 21, Lord Campbell expressed the opinion that a master might hypothecate his vessel in any case, where it might

be arrested and sold for a demand for which the owner would be liable. In an earlier case, The Augusta, 1 Dod. 283, Sir William Scott uses this language: "It has been said that the party might, by the law of Russia, have detained this ship till the money was repaid, but I do not think that circumstance alone will be sufficient to convert this into a case of hypothecation." In The Lochiel, 2 W. Rob. Adm. 44, Dr. Lushington says: "Lord Stowell, when he decided the case of The Augusta, entertained great doubt, in the first instance, whether a vessel could be legally hypothecated merely to avoid her detention, but upon subsequent consideration, he was inclined to hold that it might be an additional reason for hypothecation, and that opinion I also adopted in a case that came under my own consideration, that of The Vibilia [1 W. Rob. Adm. 7]." This case was decided in 1843. In 1849, The Osmanli was decided, a case that will doubtless be mainly relied upon by the respondent, but which is in nowise hostile to the claim of the libellant in the case at bar, as to the point actually involved and decided. Mongredieu owned the larger share in, and had the management of the ship. Messrs. Duckworth & Co. were the agents of the ship at Malta. On the occasion in question she put into Malta, and applied to the agents for coal, who, instead of supplying it, arrested the ship for a balance of Mongredieu's account current. Leonard, the managing partner of Duckworth & Co., persuaded the master to give a bottomry bond, and undertook to find a person to advance the money. He did so. Messina nominally advanced the money, and the bond was given to him. There were no peculiar circumstances in the case. After laying much stress on the fact that the bond was, in substance, a bond to the ship's agents to secure an antecedent debt, the court declared it invalid. 3 W. Rob. Adm. 198.

From these authorities, then, it would seem to be a fair and accurate statement of the present English rule on this subject, to say that, independent of other circumstances rendering it necessary and proper, a valid bottomry bond cannot be given, directly or indirectly, as security for an antecedent debt. But a valid bottomry bond may be given to relieve a ship from arrest, where that is the primary object, and the security of the debt an incident, or. as it were, an accidental circumstance, the circumstances of the ship being such as to render it prudent and judicious to obtain her discharge in this mode. And it will, therefore, upon careful examination, appear that there is really no or very little conflict between the English and American courts, the latter being, if anything (as they always are in admiralty cases) rather more liberal and catholic than the former. And it may be safely asserted that under this rule, the bond in question would be sustained owing to the overpowering necessity that gave birth to it. This class of bottomry bonds bears a very strong analogy to a ransom bill. The creditor in the former derives a benefit from the necessity which he has imposed upon the ship, as does the captor in the latter; but the obligation is given, not that this benefit may be received, but that the ship may go free.

5. It is to be inferred from the answer that it is to be contended that it was the duty of the master to communicate with his owners, but inasmuch as his owners were in New York, and he was in Antwerp, it is submitted that this point is quite destitute of plausibility. 1 Pars. Mar. Law, p. 414 et seq.

Barney, Butler & Parsons and T. E. Stillman, on behalf of the claimant, argued as follows:

1. The bottomry bond, so far as it embraces the sum of 16,575 frs., the general balance of account between the steamship Circassian, and the libellants, her consignees, is invalid for the following reasons: Advances having been made, even though by a stranger, it is too late to secure them by a subsequent bottomry, unless that security was in contemplation at the time the advances were made, or unless the advances were made upon the exclusive credit of the ship; and in respect to consignees, no presumption arises, that in making advances they do so either relying upon the credit of the ship, or in contemplation of the security of a bottomry bond. On the contrary, the true rule is, that in order to enable a consignee to secure himself by a bottomry, if, indeed, he can do so in any case, he must give notice of his intention to do so, before making the advances. 3 Kent, Comm. 460; The Augusta, 1 Dod. 283; The Jane, Id. 461; The Hunter [Case No. 6,904]; The Hero, 2 Dod. 143; The Lord Cochrane, 2 W. Rob. Adm. 320; The John & Alice [supra]; Hurry v. Hurry [Case No. 6,922]; Liebart v. The Emperor [Id. 8,340]; Selden v. Hendrickson [Id. 12,639], and cases cited; The Yuba [Id. 18,193]; The Panama [Id. 10,703]. Here the advances were made by Steineman & Ludwig, relying upon the funds which they had, and would receive as consignees, and before a bottomry bond for them was in contemplation.

2. The lender on bottomry must exhibit an account of the items advanced, with sufficient proofs to support them, to enable the court to judge of their necessity, and in order that they may be separately weighed and considered. The Aurora, 1 Wheat. [14 U. S.] 96; The Bridgewater [Case No. 1,865], and cases cited. The only account exhibited, in the case at bar, is the general one, amounting to frs. 52,886. It shows, in a great measure, only the kind of supplies and materials furnished, and not the things, nor their amount. "Ship chandlery," to the amount of frs. 7,873.64, and "cash to captain, frs. 12,300,"

are general terms. The court can form from them no opinion as to the necessity of such expenditure. It is incumbent upon the creditor who claims an hypothecation, to prove both the actual existence of the necessity of those things which give rise to his demand, and that the funds requisite to obtain those things could be procured in no other way than by the execution of a bottomry bond. The Aurora, 1 Wheat. [14 U. S.] 96. (a) As to the necessity of the items, it must be shown that the expenditure was for the safety or security of the ship, or for repairs or necessaries which were reasonably fit and proper for the completion of the voyage, and such as a prudent owner would have ordered, under all the circumstances, had he been present. Prince of Saxe Cobourg, 3 Hagg. Adm. 392, 3 Moore, P. C.; The Reliance, 3 Hagg. Adm. 74; Selden v. Hendrickson [Case No. 12,639], and cases cited; The Orelia, 3 Hagg. Adm. 75; Rucher v. Conynham [Case No. 12,106]; The Hersey, 3 Hagg. Adm. 404; Hurry v. Hurry [supra]; The John & Alice [supra]; The Augusta, 1 Dod. 287; The Medora [Case No. 9,391], and cases cited; The Osmanli, 3 W. Rob. Adm. 198; The Lord Cochrane, 2 W. Rob. Adm. 320; The Aurora, 1 Wheat. [14 U. S.] 96; The Virgin, 8 Pet. [33 U. S. 538]; The Fortitude [Case No. 4,953]; 3 Wash. C. C. 484 [Crawford v. The William Penn, Case No. 3,373]; Wainwright v. Crawford, 4 Dall. [4 U. S.] 225; Merwin v. Shailer, 16 Conn. 489; 3 Kent, Comm., and cases cited; 1 Pars. Mar. Law, p. 422, and cases cited; Burke v. The M. P. Rich, Cliff. R. 314 [Case No. 2,161], and cases cited. (b) Libellants having failed to exhibit an account of the items covered by their general balance of account, must show the actual existence of the necessity of their entire expenditure, in order to sustain the bottomry given to sustain a general balance. This they fail to do. (c) Nor can the bottomry bond be sustained on the plea that the consignees might have arrested the ship for their advances by the general maritime law. They must meet the same question of necessity as to the items furnished, in order to sustain their claim to a maritime lien, that they have to meet in order to sustain a bottomry bond (Pratt v. Reed, 19 How. [60 U. S.] 359); and a mere liability to arrest will not sustain a bottomry bond (The Osmanli, 3 W. Rob. Adm. 198; The Prince George, 4 Moore, P. C. 21; The Augusta, supra; The Royal Arch, Swab. 279), nor will a mere threat to arrest the ship, though it be for a debt of the ship (The Aurora, supra; The Boston [Case No. 1,669], and cases cited). (d) Advances to the officers and crew are not such necessaries as will justify the giving of a bottomry bond. The Cognac, 2 Hagg. Adm. 385; Furniss v. The Magoun [Case No. 5,163]. In the former case, advances paid before the termination of the voyage, and included in a bottomry bond, were disallowed, on the ground that it was a premature payment, and might never become due,

and, if paid in this form, might fall upon the owners of the cargo. In the case at bar, if such advances were allowed, they would fall upon a prior mortgagee. And, on the general principles of maritime law, the wages of the crew are made to depend upon their fidelity to the ship when she is in distress. 3 Kent, Comm. 274, and cases cited; 2 Pars. Mar. Law, 589, and cases cited; Abb. Shipp. Marg. p. 173. (e) The libellants cannot avail themselves of the words "fit and proper," found in the opinion of Judge Story, in the case of The Fortitude, supra, for these words are qualified by the expression, "such as a prudent owner would have purchased, had he been present." The conduct of the consignees, in the case at bar, was far from prudent. With the ship under attachment for frs. 39,000; forewarned, by the prevalence of cholera, that their expectations of procuring a full complement of passengers would not be realized; professedly aware of the impossibility of raising funds upon the credit of the owner of the ship, or of the Continental Mail Steamship Company; and fully aware of the existence of Mr. Fiedler's mortgage for $90,000 on the ship, they made no effort to check the reckless expenditure proven in this case, but paid bill after bill, without investigation or inquiry, and, at the last moment, sought to save themselves from loss, by shifting it upon the shoulders of the mortgagee. Such conduct, if it be not willfully fraudulent, is so grossly negligent as to be virtually so. Libellants have entirely failed to prove any effort to obtain the money necessary to cancel their claim for general balance of account in any other way than by the giving of a bottomry. As to the general balance of account, there is no evidence of the necessity of a resort to bottomry, in order to secure it. It does not follow that, because no one would advance frs. 39,000, without the security of a bottomry bond, that the sum of frs. 17,000 could not be raised without that security; and, indeed, libellants nowhere say or pretend that it could not.

3. The bond in suit is not only clearly invalid, so far as it sought to secure the general balance of account, but it is equally invalid as to the amount raised upon it to release the vessel from arrest for the debt of Salem. The attachment of the vessel at Antwerp was to enforce the payment of a debt due from William Salem, growing out of bills of exchange drawn on him, and protested for non-payment. By the general maritime law, such debt did not constitute a maritime lien upon the Circassian, nor is there any evidence that it did by the laws in force at Antwerp. The prayer of the request to seize the Circassian invokes a principle of equity, that creditors may be protected by the "order of the courts of the country where the personal property or real estate of a foreign debtor is situated, even though the creditor be also a foreigner." In every respect, so far as the papers disclose,

the proceedings at Antwerp were precisely identical with our state proceedings by attachment against non-resident debtors, and could no more constitute or give rise to a maritime lien, than could an attachment, issued out of the courts of the state of New York against a non-resident debtor, and levied upon his interest in a foreign ship. Therefore, only the interest of William Salem, over and above the mortgage, could have been attached, or sold, had the proceedings so commenced terminated in a judicial sale. The vessel was not seized under a law giving a specific lien upon the ship, as contradistinguished from a lien upon the interest of the owner in the ship, and the cases in which the master may hypothecate his ship to procure 'her discharge from arrest to enforce such lien do not apply. In such cases, good sense and equity support the bottomry, because: (a) It has been given in discharge of a debt, by which the ship has been preserved, or its value enhanced—i. e., a debt for repairs, supplies, or to relieve the vessel from distress, enable her to perform her voyage and earn freight—and has imposed no new burden upon the ship. In such a case, the lien has only changed its form from a tacit to an express one, with the addition of maritime interest. (b) The liability of a ship, in specie, for supplies and repairs furnished in a foreign port, and for advances made to relieve her when in distress from casualties incident to navigation, may be presumed to be known to all interested in her; and the law presumes their assent, when, under such circumstances, her master, unable to communicate with her owners, gives a bottomry for her relief. In the case at bar, however, the above reasons do not apply. Here, the question is simply, can a general creditor, finding a ship of his insolvent debtor in a foreign port, by means of an attachment, turn his debt from a simple contract debt into a maritime one, and thus secure the advantage of maritime interest, and the security of a bottomry? This proposition cannot be maintained. (1.) It would be unjust, and productive of irreparable damage and confusion of rights and remedies, if a creditor could, at his option, enforce and secure his simple contract debt against a debtor happening to have a ship, or an interest in a ship, in a foreign port, by converting it into a maritime lien, by hypothecation, upon the entire ship. If he could do this, then, whether the debt were valid or invalid, honest or dishonest, outlawed or still existing, usurious or otherwise, the sacred obligation of bottomry would exist therefor; and, made payable at the end of a voyage other than to the home port, it would be enforced, without an opportunity to the owner to defend himself against a claim, which, in the place where the contract was made, could never be enforced. "It would seem against the policy of the law," says Judge Story, in the case of The

Aurora, "to permit a party in this manner to obtain advantages from his contract, for which he had not originally stipulated. It would hold out temptations to fraud and imposition, and enable creditors to practice gross oppressions, against which even the vigilance and good faith of an intelligent master might not always be a sufficient safeguard in a foreign country." These results would follow, whether the bond were given directly to the creditor or to a third person. If, in the latter case, the bond could be allowed, the creditor would only need to secure the services of a friend, who should appear upon the scene as a stranger, and, after the plunder was secured, divide the profits with his principal. Rarely, if ever, could the collusion be proved to the court. (2.) In the case supposed, the rights of part owners must be overridden, and the bottomry, given to release the vessel from arrest for the debt of one part owner, must be enforced against the whole ship. The only remedy of the part owner, whose property has thus been, through the prostitution of legal process, appropriated to pay another man's debt, is a civil action against a probably insolvent debtor. (3.) If the creditor be rapacious, or the debt exceed the value of the ship, then the cargo must be embraced in the bottomry bond; for, where the master may hypothecate the ship, he may the cargo also. (4.) Not only the foregoing consequences would result from the proposition that a bottomry bond may be given to release a vessel in a foreign port from an arrest for a general debt of her owners, but, as in the case at bar, mortgagees who in good faith have advanced their money to the owner upon the security of the ship, are robbed of their priority, and postponed to subsequent general creditors, who, in their contracts, trusted to the personal credit of the owner, without any security. And, generally, it is not too much to say, that to maintain such a doctrine, would be to overturn well-settled principles of the maritime law, to the great detriment of commerce, and the security of property in ships and vessels. The bond in the case at bar is not only void upon principle, so far as it includes the moneys given to release the vessel from arrest, but is also void according to the decisions in the following cases: The Osmanli, 3 W. Rob. Adm. 198; The Aurora, 1 Wheat. [14 U. S.] 96. Even if the bond could be sustained upon principle or authority as to the frs. 39,000, there is no proof of any debt due from Salem to the attaching creditor, or that the proceedings commenced by the attachment ever established any such debt, or indeed ever proceeded to a judicial determination, or that the libellants ever paid or were called upon to pay the debt, or any part of it, or to make good their guaranty to the attaching creditors, or any part of it. They stand only in the relation of sureties to Salem, their principal. They

show neither that Salem has been called upon to pay the amount of the debt, nor that they have paid it, in his default, as sureties.

4. The evidence shows clearly that, although means existed, and were available, by which the master and consignees of the Circassian could have communicated with the owners in New York, and received their advices as to giving a bottomry bond on the ship, long before the appointed day for sailing, and long before the giving of the bond, no such communication was made or attempted. The testimony is positive, that they telegraphed to the owners in New York the arrival of the Circassian at Antwerp, and that by the same means they could have asked instructions as to the proposed bottomry bond. They should have done so. However great the necessity, and notwithstanding the presumption or probability that the owner cannot respond, the authority of the master to execute a bottomry, arising as it does clearly ex necessitate, does not exist when he can communicate with the owner. There is no pretence of an attempt to do so in this case, nor any excuse for its omission. The omission to do so is fatal to the validity of the bond in suit. La Ysabel, 1 Dod. 274; Royal Arch, Swab. 275; Wallace v. Fielden, 3 W. Rob. Adm. 243; same case, 7 Moore, P. C. 398; The Bonaparte, 8 Moore, P. C. 460; The Lord Cochrane, 2 W. Rob. Adm. 333; The Hamburg [33 Law J. Adm. 116].

BENEDICT, District Judge. In considering the questions which the facts of the case present, it may be noticed at the outset, that, although the circumstances under which this bond was taken afforded opportunity for collusion between the creditor, who attached the steamer, and the agents, who subsequently took the bond, none is suggested here. Had any circumstances appeared in any way pointing to collusion, it would have been incumbent upon the bond-holders to present a full and satisfactory explanation of them, before the court could be asked to consider their demand.

Nor is there anything oppressive in the rate of interest, which was inserted in the bond; but it is shown that the ten per cent., which is provided for, is the usual charge upon commercial advances on merchandise, intended to cover simple interest, with the difference of exchange, commissions, and insurance; so that the demand represented by the bond is simply a sum of money advanced by the libellants, with the ordinary expenses of such an advance. The case thus presents no features of hardship, as against the claimant, but, on the contrary, shows a strong equity in favor of the libellants. There appears, therefore, no reason why the bond in question should not receive that favorable consideration which courts of admiralty are always inclined to give to this class of security. It must also be held subject to those rules which the courts have declared to be applicable to such instruments.

Turning then to the bond, it is found to be composed of two items, differing from each other in their nature. One is that of frs. 16,575, consisting of the general balance of the libellants' account of advances, as agents of the steamer. As to this balance, it has been shown in evidence that the libellants made no suggestion of security for it, until after the advances had been made, and the vessel was ready to depart, when, on presenting the bond to the master for signature, they stated that they had not intended to ask security for the account, but it might as well be inserted, since a bond was to be given. This evidence brings the portion of the bond now under consideration clearly within the rule which declares that advances cannot be secured by bottomry, unless made under an agreement, or at least a reasonable expectation, founded upon surrounding circumstances, that such security would be given. The rule must therefore be applied, and, accordingly, it must be held that, as to this item, the bond is invalid.

The remainder of the principal of the bond represents the amount claimed to have been advanced by the libellants, to procure the discharge of the attachment which had been levied upon the vessel for the personal debt of the owner, as to which bottomry security was agreed on by the master.

To this item several objections have been taken, a single one of which will be noticed here. It is said that the item—assuming that it represents an actual advance by the libellants—cannot be allowed, for the reason that the maritime law does not authorize the master of a ship in any case, to raise money by bottomry for the purpose of releasing his ship from an attachment levied to collect a personal debt of the owner, for which the ship herself is in no way liable.

To the important question thus raised I have given great consideration, aided by very careful arguments on the part of the advocates, and a reference to all the cases calculated to throw light upon it. There are, undoubtedly, difficulties and dangers in permitting the exercise of such a power by the master of a ship; but there are also strong reasons against the absolute denial of the power, arising out of the nature, employment, and possible necessities of this peculiar class of property; and I greatly doubt whether the rule contended for by the claimants can be laid down as a fixed rule, applicable in all cases.

Bottomry bonds are the creatures of necessity and distress. They are permitted, in order to enable the ship to save herself from disaster, and to continue the employment for which she is constructed; and when, in any case, that object has been attained in a proper manner, by means of a bottomry bond, as a last resort, it is doubtful whether

it will do to hold that the instrument is unauthorized.

As Sir William Scott has well said: "Necessity creates the law—it suspends rules—and whatever is reasonable and just, in such cases, is likewise legal." The Gratitudine, 3 C. Rob. Adm. 266. It would seem neither reasonable nor just to say that a steamer sent out to Europe to be the pioneer vessel in a new line, when attached for a debt of the owner, and the owner's interest liable to be sold by due process of law, must therefore throw herself out of a permanent employment, and abandon her voyage, thereby rendering herself liable in rem to demands by way of damages exceeding the amount of the attaching debt, when she possesses in her bottom a sufficient basis of credit upon which the master could raise the smaller sum needed to discharge her from the attachment, and thus avert the disaster.

If, therefore, the validity of this bond depended upon the question whether a sufficient necessity existed to authorize its execution by the master, I should be inclined to hold that the peculiar and embarrassing circumstances which attended the seizure of this steamer—certain as they were, in all human probability, to bring disaster to the vessel, and great loss to all interested in her, if the seizure could not be promptly terminated—were such as to authorize the master to raise by bottomry the amount necessary to discharge the attachment. The primary object of the bond was to avoid the disaster to the steamer, which these attending circumstances would certainly entail, if the attachment continued; and the bond should not lose the characteristic which it derives from its primary object, because an incidental effect of it would be to pay a debt for which the ship herself was not liable.

But the validity of this bond cannot be made to depend upon the determination of this question alone, inasmuch as an additional objection, applicable to the whole bond, has been taken by the claimants, which the libellants have not been able satisfactorily to answer; and that is, that the master omitted to communicate with his owner, before executing the bond. Such a communication, when it can be had, is as important to be shown as the necessity of the ship. In the case of The Oriental, where the point escaped the attention of the court below, a reversal was granted upon this point alone. 7 Moore, P. C. 398. The utility of the rule requiring notice to the owner, when practicable, is obvious. It imposes no additional burden upon the ship, and no difficult duty upon the lender, while its observance makes fraud and collusion more difficult, and often dispels doubts which would otherwise arise in cases of this class. It is a rule which should not be relaxed, and in the present case—a case the equities of which I have fully stated, in order that my opinion may indicate the importance which I attach to the rule—it is fully applicable, for it is shown that there was, at the time, telegraphic communication between Antwerp and New York, the home of the owner, and that resort was had to that mode of communication to announce the steamer's arrival in Antwerp. This fact must have been known to the libellants, from their position as agents of the ship, and ordinary prudence on their part would have suggested notice to the owner of the necessity of the ship, and the intention to take a bond. They knew that such notice was practicable, and that it had not been given, and they are chargeable with knowledge that, in the absence of such notice, under the circumstances, the master was without authority to bottomry his ship.

For this reason, therefore, I must declare the bond in question not to be binding upon this steamer, and, accordingly, I dismiss the libel, with costs.